IN THE COURT OF APPEALS OF THE STATE OF IDAHO
Docket No. 45758

| STATE OF IDAHO, | ) | |
|---|---|---|
| | ) | Opinion Filed: March 3, 2020 |
| Plaintiff-Respondent, | ) | |
| | ) | Karel A. Lehrman, Clerk |
| v. | ) | |
| | ) | |
| MELONIE DAWN SMITH, | ) | |
| | ) | |
| Defendant-Appellant. | ) | |
| | ) | |

Appeal from the District Court of the Seventh Judicial District, State of Idaho, Bingham County. Hon. Darren B. Simpson, District Judge.

Judgment of conviction for murder in the first degree and destruction, alteration, or concealment of evidence, <u>affirmed</u>.

Eric D. Fredericksen, State Appellate Public Defender; Brian R. Dickson, Ben P. McGreevy, Deputy Appellate Public Defenders, Boise, for appellant. Brian R. Dickson argued.

Hon. Lawrence G. Wasden, Attorney General; Jeff D. Nye, Deputy Attorney General, Boise, for respondent. Jeff D. Nye argued.

_____

HUSKEY, Chief Judge

Melonie Dawn Smith appeals from her judgment of conviction for murder in the first degree, Idaho Code §§ 18-4001, -4002, and -4003; and destruction, alteration, or concealment of evidence, I.C § 18-2603. Smith asserts the district court erred in denying her motion to suppress evidence gathered by a warrantless search and in admitting hearsay testimony for the truth of the matter asserted at trial. Further, Smith argues fundamental error occurred at trial through the admittance of a video exhibit that included Smith's assertions of her Fourth Amendment rights. Finally, Smith contends that, in the aggregate, the errors that occurred amounted to cumulative error. Because the warrantless search was supported by the exigency and protective sweep exception to the warrant requirement, the testimony at issue was used for impeachment purposes, and Smith did not establish fundamental or cumulative error, we affirm.

1

# I.
## FACTUAL AND PROCEDURAL BACKGROUND

Guy Lopez, Smith's friend, made an in-person report at the sheriff's office stating that Smith was involved in the homicide of David Davis. Lopez reported that a few hours earlier, Smith picked him up from his home to go for a drive. Lopez stated Smith disclosed that a couple of days earlier, a man named Kevin shot Davis in the legs outside of Smith's home and then Kevin left the scene. Lopez alleged Smith went on to disclose that Davis entered Smith's home where, after attempting to help stop the bleeding, she shot Davis in the head. Lopez reported Smith revealed this information while soliciting his help in destroying Davis's body and other evidence of the crime. Smith drove Lopez to her home and, while there, Lopez reported he witnessed Davis's body wrapped in plastic, part of Davis's skull and other bones in the wood burning stove, and brain matter on the walls. Further, Lopez reported he saw that considerable efforts had been made to clean evidence from the walls surrounding the scene. Lopez gave a detailed report to the officers, which included directions to Smith's property, a map of the interior of the home, and descriptions of Smith's vehicles and guns. An interviewing officer expressed concern that Smith would continue to destroy evidence given her reported efforts to burn body parts in the wood burning stove.

Officers watched Smith's home until the officers sent to make contact with the occupants of Smith's home arrived. There were at least four vehicles in Smith's driveway when officers knocked on her door. Smith answered and engaged in conversation with the officers. The officers explained they had received a report that "something was going on" and they wanted to see if everything was okay. Smith responded that "everything's fine" and, despite the officers' concerns, no one inside needed medical attention. Smith said that her mother, Bettie Duke, was the only other person present in the home. Upon the officers' further pressing, Smith revealed that Kevin had shot Davis in the leg in Smith's driveway,[1] and both men had left the premises. A detective informed Smith he had information that indicated that Davis was dead and his body was inside Smith's home; Smith denied this information. Smith repeatedly denied the officers' requests to search her home, and she stressed they needed to get a warrant. The officers seized the home in anticipation of getting a search warrant and explained that since the home was

---

[1] The district court's findings of fact state that Lopez reported to the officers that Davis was shot in the legs, but Smith told the officers that Davis was shot in the leg.

seized, Smith and Duke needed to exit the home and any subsequent re-entry would be accompanied by an officer. Smith continued to state the officers could not enter her home without a warrant, and she called out for Duke. An officer proceeded to handcuff Smith.

Officers explained the situation to Duke and when she expressed that she was too shaky to stand in the doorway, they accompanied her inside the home despite her oral protests. The officers proceeded to walk through the home with guns drawn, with one officer repeatedly stating "Sheriff's Office, come out." In the laundry room, officers discovered a large black bag on the floor. A detective felt the end of the bag, feeling what he believed to be two feet. The officers removed Duke from the home, sealed the house, and procured a search warrant. Subsequently, the State charged Smith with murder in the first degree and destruction, alteration, or concealment of evidence.

Smith filed a motion to suppress all evidence obtained following the warrantless search of her home. The district court denied the motion, finding exigent circumstances regarding the preservation of evidence and the need for a protective sweep operated as exceptions to the warrant requirement and justified the search. Alternatively, even if the warrantless entry into Smith's home was not justified by an exception to the warrant requirement, the district court found the evidence should not be suppressed because it would have inevitably been discovered.

At the subsequent trial, the State sought to admit Exhibit 4, body camera footage from an officer that showed the initial conversation with Smith and the subsequent entry into and sweep of her home. Outside the presence of the jury, Smith objected to the evidence on foundational grounds; Smith argued the video should not be admitted as evidence unless the State laid proper foundation by first calling Lopez to testify. The court stated it would not direct the State on the order of its witnesses, but the State would need to establish foundation for the video before it would be admitted.

Subsequently, the State moved for the admission of Exhibit 4 during trial and Smith, once again, objected:

State: [A]t this point, Your Honor, I would move for the admission of State's Exhibit 4.
Court: Any objection, other than what you previously noted earlier?
Defense: Other than my previous foundational objections, I'm okay, just so the Court reserves that ruling.
Court: All right. [Smith's] previous objection that was made earlier this morning has been preserved.

3

> This Court finds that foundation for the admission of State's
> Exhibit 4 has been met, and, therefore, it will be admitted.

Later, the State admitted Exhibit 7, a video that depicted the same encounter from the perspective of a patrol vehicle's dash camera, without objection.[2]

The State called Duke to the stand who testified, among other things, that her daughter, Kellie Leslie, and her grandson, Jeremy Leslie, picked her up from a crisis center after Smith's arrest and drove her to the Boise area. Duke testified that she immediately fell asleep on the drive and denied that she spoke with Kellie and Jeremy about Davis's death or indicated that Smith was responsible for it.

Immediately following Duke's testimony, the State called Kellie and Jeremy to the stand to testify about their memories of conversations with Duke during the drive. Smith objected to both lines of questioning as hearsay, and the district court overruled both objections without further explanation. Smith did not articulate any other basis for the objection, explain how the question called for hearsay, request the court to expand on its ruling, or request the court provide the jury a limiting instruction related to the testimony. The Leslies' subsequent testimony contradicted Duke's account of the conversations that occurred during the drive. Kellie testified that while driving to the Boise area, Duke spoke about the killing and disclosed that Smith attempted to render aid after Kevin shot Davis in the legs, but Smith subsequently shot Davis in the head and proceeded to wrap his body in plastic. Kellie testified that Duke "said something like, you know, like with an animal, that [Smith] put them out of their misery." Jeremy testified that Duke did not sleep during the drive and instead spoke about Davis being killed inside Smith's home and Smith's subsequent attempts to solicit help disposing of the body.

At the close of the trial, the State offered a closing argument that included the following:

> Now, if we take the defendant's version and the defendant's version
> today--I don't want to tell you how to consider what she's said, but I want to point
> out those inconsistencies that she's had.

---

[2] Exhibit 7 was a video recording from a dash camera from an officer's patrol vehicle. Because the patrol vehicle was parked in Smith's driveway, the video shows only what occurred on Smith's porch and driveway during the encounter. However, the video's audio, as relayed by an officer's microphone, includes both the conversation with Smith on her porch and recordings of the officers' subsequent sweep. For the purpose of Smith's arguments on appeal, only the conversation between Smith and the officer outside the home are relevant, which includes visual and audio that are duplicative of Exhibit 4.

4

When law enforcement arrived at her residence . . . she told them that Kevin had shot David Davis in the legs and that he had left. No one was hurt there. No body was there. Nothing had happened inside the residence. They just needed to leave and go about their business.

That's what she wanted them to do, because she had something to hide. She preferred that that's what they would do, because she had something to hide.

She had the body of David Davis to hide, the body of David Davis that she had continually since she shot him in the back of the head, trying to figure out how she was going to get rid of it . . . .

. . . .

What else has the defendant said? We talked about her three stories. We talked about the story that she gave law enforcement at the door. We talked about the story that she provided today. We talked about the story that she provided to [her boyfriend].

Smith did not object to the State's argument.

The case was submitted to the jury. About an hour into its deliberations, the jury asked to review "the 1st video of the cops clearing the house." The bailiff played Exhibit 4 for the jurors. After approximately two and one-half hours of deliberations, the jury adjourned for the evening. The next morning, the jury deliberated for nearly eighty minutes before it found Smith guilty of murder in the first degree and destruction, alteration, or concealment of evidence. The court sentenced Smith to a determinate life sentence for first degree murder and five years, with four years determinate, for destruction, alteration, or concealment of evidence to run concurrently. Smith timely appeals.

## II.

## ANALYSIS

On appeal, Smith alleges the district court erred in denying her motion to suppress and overruling Smith's hearsay objection thereby allowing hearsay testimony to be used by the State for the truth of the matter asserted. Further, Smith argues fundamental error occurred at trial through the admittance of a video exhibit that included Smith's refusal to consent to the search of her home. Finally, Smith contends the various errors during the trial amounted to cumulative error.

### A. The District Court Did Not Err In Denying Smith's Motion to Suppress

The standard of review of a suppression motion is bifurcated. When a decision on a motion to suppress is challenged, we accept the trial court's findings of fact that are supported by substantial evidence, but we freely review the application of constitutional principles to the facts as found. *State v. Atkinson*, 128 Idaho 559, 561, 916 P.2d 1284, 1286 (Ct. App. 1996). At a

5

suppression hearing, the power to assess the credibility of witnesses, resolve factual conflicts, weigh evidence, and draw factual inferences is vested in the trial court. *State v. Valdez-Molina*, 127 Idaho 102, 106, 897 P.2d 993, 997 (1995); *State v. Schevers*, 132 Idaho 786, 789, 979 P.2d 659, 662 (Ct. App. 1999).

### 1. Exigent circumstances supported the officers' warrantless entry into Smith's home

The Fourth Amendment to the United States Constitution prohibits unreasonable searches and seizures. Warrantless searches and seizures within a home are presumptively unreasonable and therefore violate the Fourth Amendment. *State v. Sessions*, 165 Idaho 658, 660, 450 P.3d 306, 308 (2019). The State may overcome this presumption by demonstrating that a warrantless search either fell within a well-recognized exception to the warrant requirement or was otherwise reasonable under the circumstances. *State v. Weaver*, 127 Idaho 288, 290, 900 P.2d 196, 198 (1995).

Courts have recognized exigent circumstances as an exception to the warrant requirement; when the demands "of the situation make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment." *Sessions*, 165 Idaho at 658, 450 P.3d at 309. Therefore, the exigent circumstances exception inherently involves a situation where there is a compelling need for action and no time to secure a warrant. *State v. O'Keefe*, 143 Idaho 278, 283, 141 P.3d 1147, 1152 (Ct. App. 2006).

A traditional exigency that justifies a warrantless entry arises when law enforcement officers need to prevent the imminent destruction of evidence. *State v. Bunting*, 142 Idaho 908, 912, 136 P.3d 379, 383 (Ct. App. 2006). In order to validate a warrantless search under these circumstances, a court must determine that the officer's fear of imminent destruction of evidence was objectively reasonable. *State v. Holton*, 132 Idaho 501, 504, 975 P.2d 789, 792 (1999); *State v. Smith*, 159 Idaho 865, 869, 367 P.3d 260, 264 (Ct. App. 2016). The facts known to the officer at the time of the warrantless entry, and the reasonable inferences drawn from those facts, must lead a person of reasonable caution to believe the action taken was appropriate. *Smith*, 159 Idaho at 865, 367 P.3d at 264.

Although no exigency is created simply because there is probable cause to believe a serious crime has been committed, *Welsh v. Wisconsin*, 466 U.S. 740, 753 (1984), the severity of the offense which the officer believes to be in progress "is a factor to be given considerable weight when contemplating the existence and extent of exigent circumstances." *State v. Curl*,

6

125 Idaho 224, 225, 869 P.2d 224, 225 (1993). Although the Idaho Supreme Court in *Curl* used the distinction between violent and non-violent offenses to analyze the severity of the crime, *id.*, later the Supreme Court of the United States indicated the nature of the penalty for criminal conduct was a more appropriate characteristic. *Illinois v. McArthur*, 531 U.S. 326, 336 (2001). Nonetheless, the gravity of the offense remains an important factor in assessing the exigent circumstances exception to the warrant requirement, as "[p]reventing someone from disposing of or hiding a murdered corpse is clearly much more of an emergency than keeping someone from flushing a few ounces of marijuana or other controlled substances down a toilet." *Curl*, 125 Idaho at 225 n.1, 869 P.2d at 225 n.1.

Here, the district court found that Lopez's report provided a factual basis for the officers' reasonable belief that evidence could be destroyed absent a warrantless search. The court found Lopez reported, among other details, that Smith: disclosed Kevin initially shot Davis in the legs outside of her home, confessed to later killing Davis by shooting him in the head inside her home, attempted to destroy evidence of the crime by burning body parts in her stove, attempted to destroy evidence by cleaning the walls surrounding the crime scene, planned to burn the body and other evidence by burning them further, and solicited assistance in these endeavors. Lopez stated while he was in Smith's home he saw Davis's body wrapped in plastic; brain matter, blood, and human debris throughout the residence; parts of Davis's skull and bones in the wood burning stove; and that considerable efforts had been made to clean evidence from the walls. The district court found that after hearing Lopez's report at the sheriff's office, a sergeant discussed with other officers the concern that Smith would continue to destroy evidence.

The district court acknowledged that a chief deputy expressed concern over "fantastic stories" that Lopez had told in the past, but the court ultimately concluded the officers could reasonably rely on Lopez's statements. In support of that conclusion, the district court made factual findings addressing Lopez's credibility. For example, the district court found Lopez gave highly detailed information to the officers, including writing a statement for the police, drawing a diagram of the inside of Smith's home, and creating a directional map for the officers to locate the property. The district court also found the officers confirmed significant aspects of Lopez's report prior to the warrantless entry, including that Smith confirmed Kevin shot Davis in the leg in her driveway a couple of days earlier.

Based on the number of cars in the driveway, the district court found it was reasonable for the officers to believe that more people than just Duke may have been inside Smith's home at the time of the officers' warrantless entry. The court found this belief would be reasonable because Lopez described four cars in the driveway at the time he left Smith's home, but the officers noted five cars in the driveway when they arrived. The additional car, combined with Smith's statement that Kevin shot Davis on the premises, provided a reasonable basis for the officers to believe additional people may be at the residence.

Finally, the district court made factual findings that spoke to the gravity of the offenses that the officers were investigating. Murder in the first degree is punishable by a minimum of ten years and up to life imprisonment or death and/or a $50,000 fine and destruction, alteration, or concealment of evidence is punishable by up to five years in prison and/or a $10,000 fine. Based upon these facts, the district court determined the officers' fear of the imminent destruction of evidence was reasonable and supported the warrantless entry into Smith's home pursuant to the exigency exception.

Smith does not challenge any of the district court's factual findings. Because none of the district court's factual findings are challenged on appeal, this Court will analyze whether the facts support a reasonable belief in the imminent destruction of evidence, justifying the warrantless entry into Smith's home pursuant to the exigency exception of the warrant requirement.

Smith argues the facts do not support the court's determination that the officers' belief of the imminent destruction of evidence was reasonable because any reasonable fear ceased once the officers detained Smith outside of her home. Smith contends the State's assertion that Smith did not need to be present for evidence to be destroyed was not based upon the facts known to the officers upon entry--there were no signs of fire, evidence that Duke or others were part of the cleanup, or facts suggesting others were in the home. This Court disagrees.

Before entering Smith's home without a warrant, the officers were investigating allegations of murder and destruction of the victim's body. The officers had received a report that Smith had killed Davis inside her home approximately two days earlier. The report indicated Smith spent the days following the killing attempting to destroy evidence of the crime by wrapping Davis's body in plastic, cleaning brain matter from the walls, and burning body parts. Additionally, the officers had been told Smith planned to dispose of larger pieces of

8

evidence by burning the rest of Davis's body and a couch outside of her home. The officers had reason to believe these efforts were ongoing; Lopez's report indicated that, as recently as one hour before the report, Smith was actively attempting to solicit assistance to destroy evidence of the crime.

The district court found it was reasonable for the officers to believe Lopez's report was credible because it was highly detailed and included details that the officers were able to confirm once they arrived at the home and began speaking with Smith. Most notably, Smith, herself, admitted to the officers that a violent crime occurred on Smith's property two days prior which confirmed Lopez's account of the initial incident that he said lead to the homicide: a man named Kevin shot Davis in the leg outside of Smith's home two days earlier.

Because parts of Lopez's report were corroborated as the officers pursued further investigation, the details pertaining to the inherent gravity of the offenses alleged and Smith's intent on destroying the evidence of the crime became more reliable. The district court found it was reasonable for the officers to believe Smith's attempts to destroy evidence of the crime had not ended when Lopez left Smith's residence. Given these facts, it was objectively reasonable for the officers to believe in the imminent destruction of evidence.

Further, contrary to Smith's assertions, the reasonableness of this belief did not dissipate once the officers detained Smith. Given the facts known to the officers prior to the warrantless entry, it was reasonable to believe the imminent destruction of evidence did not require Smith's presence within the home. Multiple pieces of evidence were in the house and in different locations. Pieces of that evidence could easily be destroyed. The ease of destruction, like simply wiping a wall, was something that could be accomplished by Duke or any other person in the house.

Smith argues any continued concerns about destruction of evidence after Smith's detainment was hypothetical and hypothetical concerns about destruction of evidence are unreasonable. For instance, Smith contends the officers' concern about the evidence continuing to burn after Smith's detainment would not be reasonable unless an officer witnessed a fire. But the evidence to be preserved was not just evidence that could be burned. It included evidence that could be wiped from walls, floors, and others parts of the scene. Courts have not held that personal observation of the destruction of evidence is required for the application of the exigency exception. Although a hypothetical fear without any factual support would not be reasonable,

9

personal observation of destruction of evidence is not required if the facts and the reasonable inferences drawn therefrom warrant a person of reasonable caution in the belief that the action taken was appropriate. *Smith*, 159 Idaho at 869, 367 P.3d at 264.

Here, due to Smith's persistent and active efforts to destroy evidence, the gravity of the offense being investigated, and the likelihood the efforts would continue after Smith was detained, the district court correctly concluded the officers reasonably believed evidence might be destroyed before a warrant could be obtained, thus establishing that exigent circumstances necessitated a warrantless entry into the house. We affirm the district court's denial of Smith's motion to suppress on this ground.

## 2. The protective sweep exception supported the officers' sweep of Smith's home

The facts also support the protective sweep exception to the warrant requirement. A protective sweep may justify a warrantless entry into a residence where articulable facts, and the rational inferences from those facts, would warrant a reasonably prudent officer's belief that the area to be swept harbors an individual posing a danger to those on the scene of the arrest. *Maryland v. Buie*, 494 U.S. 325, 334 (1990); *see also State v. Revenaugh*, 133 Idaho 774, 778, 992 P.2d 769, 773 (1999) (holding protective sweep exception applies when an individual is arrested or detained outside of residence). No individual fact, including absolute proof that someone is inside the home, is necessary if the combination of circumstances creates a reasonable, articulable suspicion that someone might be in the residence who could pose a threat to the officers on the scene. *Revenaugh*, 133 Idaho at 778, 992 P.2d at 773. The sweep must be confined to a cursory inspection of those spaces where a person may be found and may not last longer than necessary to dispel the reasonable suspicion of danger. *Buie*, 494 U.S. at 335-36.

At oral argument, Smith conceded that when Duke re-entered the home to sit down, the officers could have legally accompanied Duke inside to prevent the destruction of evidence pursuant to *Illinois v. McArthur*, 531 U.S. 326 (2001). Once inside, the officers were justified in their cursory sweep of the home under the protective sweep exception. The district court found the officers arrived at Smith's home late at night, the home was cluttered with debris, the lights were off, and there were spaces large enough to hold a human body. Further, the court found Lopez reported the presence of multiple guns and the use of an armor-piercing bullet on the property. As with the report of destruction of evidence, Lopez's report of weapons gained credibility when Smith admitted that a shooting had taken place. Finally, as previously

10

discussed, the officers had reasonable, articulable suspicion that others, besides Duke, may be present inside the home. Taken together, these facts rise to the level of reasonable, articulable suspicion that Smith's home harbored an individual posing a danger to those on the scene of the arrest and, therefore, the cursory search of Smith's home was valid under the protective sweep exception to the warrant requirement.

Because Smith conceded at oral argument that the presence of either the exigent circumstance or protective sweep exception justifies the search and negates the consideration of the inevitable discovery doctrine, we need not engage in further analysis.

**B.    The District Court Did Not Err in Overruling Smith's Hearsay Objection Because It Was Not Offered for Proof of the Matter Asserted**

Smith argues the district court erred in allowing the Leslies to testify about statements Duke made after Smith's arrest. Smith admits the State initially introduced testimony from the Leslies at trial to contradict the testimony of Duke. However, Smith argues the district court allowed the testimony to be used for proof of Smith's guilt by overruling Smith's hearsay objection without providing a limiting instruction to the jury explaining the statements could only be used for Duke's impeachment. The State responds that, pursuant to Idaho Rule of Evidence 105, the court had no obligation to instruct the jury on the limited purpose of the admitted evidence absent a request from Smith.

Hearsay is defined as a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted. I.R.E. 801(c); *State v. Gomez*, 126 Idaho 700, 704, 889 P.2d 729, 733 (Ct. App. 1994). Hearsay is inadmissible unless otherwise provided by an exception in the Idaho Rules of Evidence or other rules of the Idaho Supreme Court. I.R.E. 802. Because hearsay requires that the statement is to prove the truth of the matter asserted, out-of-court statements admitted to impeach someone's credibility are not hearsay. *Herrick v. Leuzinger*, 127 Idaho 293, 304, 900 P.2d 201, 212 (Ct. App. 1995).

"When evidence which is admissible as to one party for one purpose but not admissible as to another party or for another purpose is admitted, the court, upon request, shall restrict the evidence to its proper scope and instruct the jury accordingly." I.R.E. 105 (2017). This rule provides a procedural mechanism for a party to limit the scope of the evidence to impeachment of a witness. *See State v. Osterhoudt*, 155 Idaho 867, 876, 318 P.3d 636, 645 (Ct. App. 2013). However, by its plain language, Rule 105 requires a party to request the court to give an appropriate limiting instruction. *State v. Moore*, 131 Idaho 814, 823, 965 P.2d 174, 183 (1998).

11

It does not impose a requirement on the court to give the instruction independently of such request. *Id.*; *see also Osterhoudt*, 155 Idaho at 876, 318 P.3d at 645 (holding the district court did not err in failing to give a limiting instruction sua sponte because the court is only required to give a limiting instruction when a party requests such an instruction). This procedural principle is reflected in the official comment to Idaho Criminal Jury Instruction 318, which provides a template limiting instruction for the court to use in such circumstances: "The committee recommends that this instruction be given immediately following the witness' testimony upon request made by the party opposing the impeachment. If this instruction is not requested prior to or immediately after the testimony, the trial court does not err in failing to give it." I.C.J.I. 318 (citing *State v. Vaughn*, 124 Idaho 576, 861 P.2d 1241 (Ct. App. 1993)).

Smith relies on this Court's decision in *State v. Gerardo*, 147 Idaho 22, 205 P.3d 671 (Ct. App. 2009) for the proposition that a trial court must identify that evidence is being admitted for a limited purpose in order to put the parties on notice that a limiting instruction may be requested. In *Gerardo*, the trial court overruled the defendant's hearsay objection raised during a motion in limine, erroneously finding the statement constituted a non-hearsay admission of a party opponent. *Id.* at 25, 205 P.3d at 674. Gerardo appealed, arguing the statement constituted inadmissible hearsay. *Id.* On appeal, instead of maintaining the trial court did not err in finding the statement at issue was a non-hearsay admission of a party opponent, the State argued it was non-hearsay because it was not offered for proof of the matter asserted. *Id.* This Court held that because the trial court did not admit the evidence for the limited purpose alleged by the State on appeal, Gerardo was not alerted to the opportunity to request a limiting instruction informing the jury that the statement could not be used as proof of the matter asserted. *Id.*

Here, however, the context of the Leslies' testimony clearly indicates the State wished to use the testimony to impeach Duke's credibility. Immediately following Duke's testimony denying having any substantive conversations with the Leslies during the drive back to the Boise area, the State called the Leslies as witnesses and tailored its questions to draw contrast to Duke's contentions. In fact, on appeal Smith admits the State offered the Leslies' testimony to contradict Duke's assertions that she never spoke to the Leslies about Smith's involvement in Davis's death. Therefore, unlike *Gerardo*, Smith had notice of the purpose for which the State was seeking to admit the evidence during trial.

12

Further, Smith does not provide argument that the district court did not understand that the purpose of the evidence was to impeach Duke's testimony when it overruled Smith's objection. To presume error by the district court would be in contrast to I.R.E. 105 (2017), which indicates the court knows the proper scope of the evidence and, upon request from a party, will instruct the jury accordingly. Thus, Smith was required to request a limiting instruction from the trial court if she desired to have the court instruct the jury that the Leslies' statements could only be used to impeach Duke's credibility, not as proof of Smith's guilt.

## C.     Smith Has Not Established Fundamental Error by the Admission of Exhibit 4

Smith argues the State committed fundamental error by admitting Exhibit 4, body camera footage from the officers' initial conversation with Smith and subsequent entry into her home. Smith argues because the video showed Smith refusing to consent to a search of her home, it was an unconstitutional comment upon her assertion of her Fourth Amendment rights.

Generally, issues not raised below may not be considered for the first time on appeal. *State v. Fodge*, 121 Idaho 192, 195, 824 P.2d 123, 126 (1992). However, when a defendant alleges that a constitutional error occurred at trial and the alleged error was not followed by a contemporaneous objection, the claim of error must be reviewed under the fundamental error doctrine. *State v. Miller*, 165 Idaho 115, 119, 443 P.3d 129, 133 (2019). In order to obtain relief under the fundamental error doctrine, the defendant must demonstrate three things. First, the defendant must show that one or more of the defendant's unwaived constitutional rights were violated. *Id.* Second, the error must be clear and obvious, meaning the record must demonstrate evidence of the error and evidence as to whether or not trial counsel made a tactical decision not to object. *Id.* Third, the defendant must demonstrate that the error affected the defendant's substantial rights, which means the error identified in the first and second prongs of the test actually affected the outcome of the trial. *Id.* at 119-20, 443 P.3d at 133-34.

Fundamental error is not a right of review, it is simply a standard created and utilized by our appellate courts for review of unobjected to constitutional errors. *State v. Briggs*, 162 Idaho 736, 739 n.2, 404 P.3d 1287, 1290 n.2 (Ct. App. 2017). Here, Smith objected to the admission of Exhibit 4. When a defendant offers an objection at trial, the issue is instead preserved for appellate review under the harmless error analysis. *State v. Diaz*, 163 Idaho 165, 170, 408 P.3d 920, 925 (Ct. App. 2017). Under the harmless error analysis, the defendant must initially establish to the appellate court that a violation occurred, and then the State must demonstrate

13

beyond a reasonable doubt that the constitutional violation did not contribute to the jury's verdict. *State v. Johnson*, 163 Idaho 412, 421, 414 P.3d 234, 243 (2018). In other words, the error is harmless if the Court finds that the result would be the same without the error. *State v. Montgomery*, 163 Idaho 40, 46, 408 P.3d 38, 44 (2017).

A party may not attempt to transform actual evidentiary objections at trial into claims of unobjected-to error on appeal. *Diaz*, 163 Idaho at 170, 408 P.3d at 925. Instead, when a party objects at trial but fails to provide an adequate basis for the court to exclude the evidence, the error is subject to a harmless error analysis. *Id.* This Court has held it will not consider an error unobjected to when a party articulates a specific basis to exclude evidence at trial, receives a ruling from the court, and then fails to offer a different basis on which to exclude the evidence. *Id.* at 169-70, 408 P.3d at 924-25; *see also Briggs*, 162 Idaho at 739, 404 P.3d at 1290.

Allowing a party to convert objections at trial to claims of unobjected-to error on appeal would be in contrast to the Idaho Supreme Court's holding in *Perry*, as this Court articulated in *Diaz*:

> The *Perry* opinion defined fundamental error as, [e]rror [that] goes to the foundation or basis of a defendant's rights or must go to the foundation of the case or take from the defendant a right which was essential to his defense and which no court could or ought to permit him to waive. *Perry*, 150 Idaho at 226, 245 P.3d at 978. Trial counsel's inadequate evidentiary objection did not rise to this level and even if it did, it is more appropriately dealt with in post-conviction proceedings. In cases of unobjected to error, the appellate court's authority to remedy that error is strictly circumscribed to cases where the error results in the defendant being deprived of his or her Fourteenth Amendment due process right to a fair trial in a fair tribunal. *Id.* at 224, 245 P.3d at 976. A substantial right of the defendant is not infringed upon just because his or her trial counsel fails to make an appropriate evidentiary objection. In fact, where the asserted error relates not to infringement upon a constitutional right, but to violation of a rule or statute, we hold that the 'fundamental error' doctrine is not invoked. *Id.* at 226, 245 P.3d at 978.

*Diaz*, 163 Idaho at 170, 408 P.3d at 925.

If this Court were to find that objected-to errors could be transformed to an additional claim of unobjected-to error based on semantics, there would no longer be a distinction between the two types of errors. Each evidentiary claim would give rise to two claims on appeal: arguing against the admission of the evidence based on the objection actually made and arguing against the admission of the same evidence based on additional objections that counsel could have made at trial but did not. This would relieve trial counsel of the responsibility to make all relevant and

14

necessary objections during trial. Further, as demonstrated by Smith's explicit arguments on appeal, a party could reason counsel's objection on evidentiary grounds at trial preserves that issue for appeal under the harmless error analysis *and* strengthens a future claim under fundamental error by providing evidence in the record that counsel desired to keep the evidence out of the trial through the use of a contemporaneous objection.

Smith argues this Court's determination of what is considered objected-to error for appellate purposes is not proper in light of the Idaho Supreme Court's holding in *State v. Easley*, 156 Idaho 214, 322 P.3d 296 (2014). In *Easley*, the Court was faced with a separation of powers claim; whether it was constitutional for a prosecutor to unilaterally veto a trial court's decision to sentence a defendant to mental health court. *Id.* at 220, 322 P.3d at 302. Easley objected to the prosecutorial veto on various constitutional grounds, but the trial court declined to address her concerns, stating they needed to be "addressed at a higher level." *Id.* On appeal, Easley asserted she could raise a separation of powers issue for the first time on appeal because it constituted fundamental error. *Id.* at 221, 322 P.3d at 303. The Idaho Supreme Court acknowledged Easley argued her claim under fundamental error, but the Court did not specifically engage in a review under fundamental error analysis in its decision. Instead of citing to either the fundamental error or harmless error standard, the Court pursued a hybrid analysis. The Court noted that Easley had objected to the prosecutorial veto process on numerous grounds and held the veto process was unconstitutional, the record was clear that the court had improperly contracted away its sentencing authority, and the error was not harmless. Although the Court used the words "fundamental error," the Court actually conducted a harmless error analysis. *Id.* As Easley concerned an objected-to error and the Court did not engage in a fundamental error analysis, regardless of the language used, this Court finds *Easley* distinguishable.[3]

Even if the admission of Exhibit 4 was subject to fundamental error review, Smith has not established any prong of the fundamental error analysis. First, Smith has not shown that the admission of Exhibit 4 violated one of her unwaived constitutional rights. Although it is

---

[3] Additionally, this Court has previously held *State v. Easley*, 156 Idaho 214, 322 P.3d 296 (2014) did not impact established precedent following the Court's decision in *State v. Perry*, 150 Idaho 209, 245 P.3d 961 (2010). *State v. Moore*, 158 Idaho 943, 948, 354 P.3d 505, 510 (Ct. App. 2015) (holding that because the defendant did not hold a constitutional right to the separation of powers, he could not establish a violation of a constitutional right under the first prong of the fundamental error analysis).

erroneous for a prosecutor to introduce evidence of a defendant's assertion of her Fourth Amendment right as evidence of guilt or for impeachment purposes, *State v. Christiansen*, 144 Idaho 463, 470, 163 P.3d 1175, 1182 (2007), Smith has not demonstrated the State introduced Exhibit 4 for either of these purposes. Smith directs this Court to the State's closing argument as evidence that the State admitted Exhibit 4 to infer Smith's guilt. However, in context, the framing of the State's closing argument suggests the State admitted Exhibit 4 not to comment on Smith's Fourth Amendment rights, but instead to demonstrate that, unlike the other witness involved in the shooting of Davis, Smith's narrative of events changed over the course of the proceedings; she initially told the officers that Davis had left days earlier, and therefore they did not need to search her home, but she proceeded to change her story after the officers discovered his body inside:

> [Kevin] told you what he did. He told you what he did afterwards. And he was consistent. At no point was he not consistent about what had occurred that morning.
> Now, if we take the defendant's version and the defendant's version today--I don't want to tell you how to consider what she's said, but I want to point out those inconsistencies that she's had.
> When law enforcement arrived at her residence . . . she told them that Kevin had shot David Davis in the legs and that he had left. No one was hurt there. No body was there. Nothing had happened inside the residence. They just needed to leave and go about their business.
> That's what she wanted them to do, because she had something to hide. She preferred that that's what they would do, because she had something to hide.
> She had the body of David Davis to hide, the body of David Davis that she had continually since she shot him in the back of the head, trying to figure out how she was going to get rid of it. And she had continually tried to figure out how she was going to get help in order to accomplish that.
> You heard what she told you today, but you also heard what it is she told [her boyfriend]. She told [her boyfriend] her mother did it.
> What else has the defendant said? We talked about her three stories. We talked about the story that she gave law enforcement at the door. We talked about the story that she provided today. We talked about the story that she provided to [her boyfriend].

The State does not violate Smith's constitutional rights by admitting evidence to comment on Smith's evolving narratives related to Davis's death.

Second, Smith has not demonstrated the error complained of is clear from the record. The Idaho Supreme Court has previously held an error is plain when the State makes clear references to a defendant's assertion of a Fourth Amendment right. *See Christiansen*, 144 Idaho

16

at 470, 163 P.3d at 1182 (holding prosecutor's explicit questions concerning defendant's refusal to consent to search constituted prosecutorial error); *see also State v. Skunkcap*, 157 Idaho 221, 234-35, 335 P.3d 561, 574-75 (2014) (holding prosecutor's direct questioning of officer about defendant's repeated assertion of his right to be silent was prosecutorial error). Here, the State did not attempt to elicit any testimony concerning Smith's refusal to consent to a search of her home and, as discussed previously, the State did not comment upon Smith's refusal during closing argument. Therefore, by itself, the admission of a fourteen-minute video does not demonstrate evidence of clear and obvious error in the record.

Finally, Smith has not established the admission of Exhibit 4 into evidence actually affected the outcome of the trial. To the extent Exhibit 4 was important to the jury's assessment of Smith's credibility, the portions of the exhibit which depict Smith asserting her Fourth Amendment rights were also admitted without objection through Exhibit 7. Therefore, even if Exhibit 4 was excluded, the jury would have been able to consider the same conversation at issue through Exhibit 7, and the result would have been the same even if Exhibit 4 had been excluded. Therefore, Smith cannot establish the third prong of the analysis. *See Montgomery*, 163 Idaho at 46, 408 P.3d at 44.

Additionally, although the jury requested to review Exhibit 4 during deliberations, indicating that at least one juror was interested in its contents, the request alone does not establish the exhibit actually affected the outcome of Smith's trial. Exhibit 4 represents two events: the officers' initial conversation with Smith on her front porch and the subsequent entry and sweep of her home. The record does not provide evidence that the jury was interested in the portion of the video containing Smith's assertions of her Fourth Amendment rights. In fact, the record indicates the jury was only interested in the portion of the recording where the officers entered Smith's home and conducted a sweep, as the jury specified that it "would like to see the 1st video of the cops clearing the house." Taken together, the record does not establish a link between Smith's refusal to consent to the search as shown in Exhibit 4 and the jury's guilty verdict. Therefore, Smith has not established the admittance of Exhibit 4 met any prong of the fundamental error analysis.

17

**D.     Cumulative Error**

Smith also contends that the cumulative error doctrine applies here, necessitating a reversal of her conviction.  Under the doctrine of cumulative error, a series of errors, harmless in and of themselves, may in the aggregate show the absence of a fair trial.  *State v. Adamcik*, 152 Idaho 445, 483, 272 P.3d 417, 455 (2012).  However, a necessary predicate to the application of the doctrine is a finding of more than one error.  *Id.*  Smith has failed to demonstrate at least two errors, a necessary predicate to the application of the cumulative error doctrine.

## IV.

## CONCLUSION

The district court did not err in denying Smith's motion to suppress because the warrantless search was supported by the exigency and protective sweep exceptions to the warrant requirement.  Secondly, the district court did not err in overruling Smith's hearsay objections because the State did not offer the testimony for proof of the matter asserted.  Additionally, Smith did not establish the admission of the video evidence constituted fundamental error.  Finally, Smith did not establish the necessary predicate for the application of the cumulative error doctrine.  Accordingly, the district court's judgment of conviction is affirmed.

Judge GRATTON and Judge LORELLO **CONCUR**.